# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carla Slater,                          :
                    Petitioner         :
                                       :
              v.                       :
                                       :
Unemployment Compensation              :
Board of Review,                       :    No. 958 C.D. 2017
                    Respondent         :    Submitted: December 15, 2017


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                   FILED: March 13, 2018


Carla Slater (Claimant) petitions this Court, pro se, for review of the Unemployment Compensation (UC) Board of Review's (UCBR) June 20, 2017 order affirming the Referee's decision that Claimant was ineligible for UC benefits under Section 402(b) of the UC Law (Law).[1] Essentially, the issue before this Court is whether the UCBR erred by concluding that Claimant voluntarily quit her job as a Tax Examiner Technician with the United States Department of Treasury, Internal Revenue Service (IRS) (Employer).[2] After review, we affirm.

---

[1] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b) (relating to voluntary separation without cause of a necessitous and compelling nature).

[2] Claimant's Statement of the Questions Involved lists eight questions, all of which are subsumed in the stated issue and discussed herein. Specifically, Claimant inquired:

      1. Did [Claimant] quit or was she fired? . . .

      2. Did [Claimant] have a contractual agreement with [Employer]? . . .

      3. What was the length or duration of the seasonal contract? . . .

      4. State the exact date when [Claimant's] seasonal contract expired?

      5. Did [Employer] violate [Claimant's] seasonal contract?

Claimant worked as a full-time seasonal employee for Employer beginning on October 8, 2008. During Claimant's employment, her work schedule was contingent upon Employer's workload. By March 3, 2015 email, Claimant informed Employer that, due to a religious convention she had been selected to attend in China, she would "not be in the office for the entire month of November." Certified Record (C.R.) Item 7, Notes of Testimony, March 24, 2017 (N.T.) Ex. Employer 1 at 4; *see also* Reproduced Record (R.R.) at 3-5. Claimant further stated therein: "If I am not furlough[ed] by this time, I would like to use annual leave and leave without pay [(LWOP)] to cover this time." N.T. Ex. Employer 1 at 4; *see also* R.R. at 3.

Employer's Team Manager Stephanie Spross (Spross) responded to Claimant's letter by March 31, 2015 memorandum:

> At this time, [LWOP] is not being approved. Please provide a repayment plan[3] for working religious compensation [(comp)4] for the time being requested.
>
> In accordance with the [IRS] Rules of Conduct, you are required to adhere to the following rules re: Performance of Duty which states in part[:] 'You are expected to respond readily to the direction of your supervisors, etc.['] Also, Observance of Duty Hours which states[:] 'You must observe designated duty hours and be punctual in reporting for work and returning from lunch and breaks. Leave is to be used in accordance with its intended purpose and must be approved in advance whenever possible.

6. Was [Claimant] entitled to [UC] benefits based on the seasonal contract?
7. Did [Claimant] communicate with [Employer] prior to and after October 29, 2015? . . .
8. Did [Claimant] receive a new seasonal contract in January 2016?
Claimant Br. at 6.

[3] Employer requested Claimant to provide her plan on how she would have sufficient leave time to accommodate her month-long vacation request.

[4] Federal executive agencies are authorized to allow employees to work compensatory overtime to accommodate for time off for religious purposes. *See* 5 C.F.R. § 550.1002.

2

[Absence Without Leave (]AWOL[)] charges, and/or failure to follow the proper procedures to request leave, and/or failure to adhere to any other rules regarding an ethic or conduct issue may lead to disciplinary or adverse action up to and including removal from the [IRS].

N.T. Ex. Employer 1 at 1; *see also* N.T. Ex. UC Service Center 9, 28; N.T. at 23. Claimant refused to sign the March 2015 memorandum as requested, and did not provide Employer with a repayment plan. *See* Ex. Employer 1 at 1; *see also* N.T. at 10. Claimant continued to work for Employer until October 29, 2015. However, she did not report to work as scheduled on November 2, 2015 or any time thereafter.

By November 6, 2015 memorandum sent by regular and certified mail, Spross notified Claimant that because she failed to report for scheduled duty November 2 to November 6, 2015 and failed to follow proper leave procedures, she was being charged 44 hours AWOL. *See* N.T. Ex. Employer 5. Employer sent similar memoranda on November 13 (for 36 AWOL hours for November 9, 11, 12 and 13, 2015) and November 27 (for 80 AWOL hours for November 16-20, 23, 25-27, 2015).[5] *See* N.T. Exs. Employer 6-7.

Claimant applied for UC benefits on November 29, 2015. On January 19, 2017, the Duquesne UC Service Center determined that Claimant was ineligible for UC benefits under Section 402(b) of the Law, and assessed a fault overpayment against Claimant for $11,388.00 in UC benefits she received for claim weeks from December 12, 2015 through June 4, 2016.[6] Claimant appealed, and a Referee hearing

---

[5] Employer also sent Claimant memoranda on December 11, 2015 (for 80 AWOL hours for November 30, December 1-4, 7, 9-11), December 24, 2015 (for 53 AWOL hours for December 17-18, 21, 23-25), January 8, 2016 (for 80 AWOL hours for December 28-31, January 1, 4, 6-8) and January 22, 2016 (for 80 AWOL hours for January 11-15, 18, 20-22). *See* N.T. Exs. Employer 8-11; *see also* N.T. at 26-27, 31-33. On January 19, 2016, Employer ordered Claimant to return to work. *See* N.T. Ex. UC Service Center 21; *see also* N.T. at 27.

[6] According to the notice, the fault overpayment was based upon Claimant's report to the Department of Labor and Industry, Office of UC Benefits that she was "unemployed due to a lack of work[, when i]t was determined that [she] actually quit [her] employment with [Employer] when

3

was held on March 24, 2017. On April 3, 2017, the Referee affirmed the UC Service Center's determination. Claimant appealed to the UCBR. On June 20, 2017, the UCBR adopted the Referee's conclusions, and affirmed the Referee's decision, but modified the Referee's findings of fact. Claimant appealed to this Court.[7]

Initially, Section 402(b) of the Law states, in relevant part: "An employe shall be ineligible for compensation for any week . . . [i]n which h[er] unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature[.]" 43 P.S. § 802(b). This Court has explained:

> Whether a claimant had cause of a necessitous and compelling nature for leaving work is a question of law subject to this Court's review. A claimant who voluntarily quits his employment bears the burden of proving that necessitous and compelling reasons motivated that decision. In order to establish cause of a necessitous and compelling nature, a claimant must establish that (1) circumstances existed that produced real and substantial pressure to terminate employment, (2) like circumstances would compel a reasonable person to act in the same manner, (3) the claimant acted with ordinary common sense, and (4) the claimant made a reasonable effort to preserve her employment.

*Middletown Twp. v. Unemployment Comp. Bd. of Review*, 40 A.3d 217, 227-28 (Pa. Cmwlth. 2012) (citations omitted). "A voluntary termination is not limited to a formal or even an express resignation; it can be inferred from the employee's conduct." *Wise v. Unemployment Comp. Bd. of Review*, 111 A.3d 1256, 1263 (Pa. Cmwlth. 2015). Certainly, "[w]hen an employee resigns, leaves, or quits without action by the employer, the employee has voluntarily quit for purposes of

---

[she] failed to return to work." C. R. Item 3 (UC Service Center Notice of Fault Determination). Claimant did not challenge the fault overpayment on appeal.

[7] "Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Turgeon v. Unemployment Comp. Bd. of Review*, 64 A.3d 729, 731 n.3 (Pa. Cmwlth. 2013).

4

unemployment benefits." *Lee v. Unemployment Comp. Bd. of Review*, 33 A.3d 717, 720 (Pa. Cmwlth. 2011). Ultimately, "[i]n determining whether a claimant has quit voluntarily, this Court considers the totality of the circumstances." *Id.*

Claimant argues that the UCBR erred by concluding that she voluntarily quit her employment since she worked under a seasonal contract in 2015 that only afforded her 9 to 11 months of work, and she notified Employer that she would be off work for the month of November 2015.[8] At the Referee hearing, Claimant admitted that she was aware of Employer's proper leave request procedures. *See* N.T. at 15; *see also* N.T. Ex. UC Service Center 28-29. She claimed she verbally responded to Employer's March 2015 memorandum by explaining that since she is normally furloughed in November[9] and does not have to report to work for the rest of the year, it was impractical for her to repay the hours in advance of her trip. *See* N.T. at 10. Claimant further related that, despite having accrued and used religious comp time in the past, her personal health issues and her religious and family obligations[10] made it impossible for her to repay the November 2015 hours. *See* N.T. at 10-12, 15.

Claimant recalled Spross reiterating that she could use her accrued annual leave for her trip, and could build up religious comp time, but that her LWOP was denied. *See* N.T. at 14. Claimant contends that she was never informed that she could not take her trip or that she would be discharged for doing so. *See* N.T. at 15. She further asserts that she asked Employer after her November 2015 trip whether she was still a seasonal employee, and Employer said yes; however, she did not ask Employer whether she had been furloughed. *See* N.T. at 16. According to the record,

---

[8] Claimant admitted that she returned from China on or about November 15, 2015, but did not return to work because she was taking care of her mother. *See* N.T. at 12.

[9] Claimant admitted that her typical furlough varied from year-to-year. *See* N.T. at 16.

[10] Claimant expressed that she is "basically a minister" and is required to volunteer 140 hours per year. She is also her mother's sole caregiver. N.T. at 11; *see also* N.T. at 11-12.

Claimant applied for UC benefits on November 20, 2015. However, she did not respond to or contact Employer until June 13, 2016.

Spross explained that Claimant's seasonal contract covering her November 2015 employment began on February 23, 2015, and specified that Claimant was to work 80 hours per pay period (*i.e.*, 160 hours per month) for 9 to 11 months, unless and until she was furloughed. *See* N.T. at 18-19; *see also* N.T. Ex. UC Service Center 11, 18a; R.R. at 11. She expressed that when furloughs are made due to lack of work, employees are given at least 30 days' notice before being laid off, and several months or even years could go by until furloughed employees are recalled. *See* N.T at 21. Spross maintained that Employer did not discuss furloughs either when Claimant notified Employer of her trip, or at any time before her trip. *See* N.T at 21.

Spross recollected Claimant stating she was taking the March 2015 memorandum and she would have to discuss it with her union representative. *See* N.T. at 17. Spross recounted that, since Employer never heard back from Claimant, Employer did not know whether Claimant still planned to take the trip – "[s]he just did not show up to work." N.T. at 23. Spross further described that, at the time Claimant left, she had not presented a repayment plan, she had only .25 hours of annual leave accrued, and she had a negative sick leave balance. *See* N.T. at 17, 23; *see also* N.T. Ex. UC Service Center 25 (Statement of Earnings and Leave). Spross asserted that, although Claimant had been furloughed every year since 2012, Claimant was not furloughed under her 2015 contract,[11] she did not have sufficient leave to take the month of November off, and she failed to make other arrangements to make up the time. *See* N.T. at 18-19.

---

[11] Claimant's January 2015 furlough fell under the seasonal contract Claimant entered into in 2014. *See* N.T. at 20.

Spross explained that, by June 15, 2015 memorandum, Employer notified its seasonal employees, including Claimant, that it was converting its seasonal positions to a year-round schedule effective June 28, 2015. *See* N.T. at 29; *see also* N.T. Ex. UC Service Center 18b. Claimant responded on June 16, 2015 that she is "prohibited from working year[-]round due to religious obligations[, and] request[ed] a seasonal position in another department." N.T. Ex. UC Service Center 18b. On November 4, 2015, Spross emailed Claimant a copy of Employer's November 3, 2015 memorandum to seasonal employees who did not accept year-round employment outlining their options in light of Employer's conversion. *See* N.T. at 21-22; *see also* N.T. Ex. Employer 2, 3; R.R. at 8; N.T. at 27, 29-30. On November 4, 2015, Claimant emailed Spross:

> As I mentioned previously, I am not interested in any permanent position at the IRS not now or ever. I had requested a seasonal position. If this is not possible, please fire me so I can collect [UC]. My message is very clear. Please do not contact me again during my convention.

N.T. Ex. Employer 3; *see also* N.T. Ex. UC Service Center 26; R.R. at 8; N.T. at 27-28. Notwithstanding, on December 16, 2015, Employer offered Claimant a seasonal position, which Claimant had 10 days to accept. *See* N.T. Ex. Employer 4; *see also* N.T. Ex. UC Service Center 19; N.T. at 28. During this time, however, Employer continued to warn Claimant of her AWOL status. *See* N.T. Exs. Employer 8-11; *see also* N.T. at 26-27, 31-33. Claimant did not respond.

According to Spross, Employer notified Claimant by January 19, 2016 letter that she "ha[d] been carried in an [AWOL] status" by Employer since November 2, 2015, and instructed Claimant to "report for duty immediately after [her] receipt of [that] letter." N.T. Ex. UC Service Center 21; *see also* N.T. at 25-26. By June 1, 2016 letter, Employer notified Claimant that since she failed to respond to

its January 19, 2016 letter, that was its "final request and a final directive . . . to report for duty." N.T. Ex. UC Service Center 22.

On June 13, 2016, Claimant sent a letter to Spross inquiring as to the status of documentation for her return to work as a seasonal employee, and representing that she preferred "a six to eight month[] seasonal position working from 6:00am – 3:30pm." N.T. Ex. UC Service Center 14; *see also* R.R. at 9. On August 9, 2016, Claimant sent Spross a follow-up email explaining that she was awaiting Employer's response regarding her seasonal employment request. *See* N.T. Ex. Employer 13; *see also* N.T. Ex. UC Service Center 23; R.R. at 10.

Employer's Department Manager Keeya Gaskin (Gaskin) testified she emailed Claimant on August 24, 2016, stating that since attempts to contact her were unsuccessful, it was imperative for Claimant to contact Gaskin regarding her work status. *See* N.T. at 35-36; *see also* N.T. Ex. Employer 13. Because Claimant did not respond, Gaskin emailed Claimant again on August 30, 2016. *See* N.T. Ex. Employer 13. On or about August 30, 2016, Gaskin and Claimant spoke over the telephone, and Gaskin informed Claimant that she had not been furloughed, and she should immediately report for duty, but Claimant refused because she was caring for her mother. N.T. at 35-36.

Gaskin recalled that she supplied Claimant with Family and Medical Leave Act (FMLA)[12] forms by September 2, 2016 email for Claimant to seek leave to care for her mother, and asked that the forms be completed and returned by September 26, 2016. *See* N.T. at 34-36; *see also* N.T. Ex. Employer 12. Claimant responded that she was unable to provide the FMLA documents before September 26, 2016, and that she was still awaiting Employer's response to her seasonal employment request and the deletion of her AWOL and suspension notices. *See* N.T.

_____

[12] 29 U.S.C. §§ 2601-2654.

8

Ex. Employer 12. By September 21, 2016 email, Spross notified Claimant that she was "being charged AWOL until either [she] report[ed] to work or [] provide[d] sufficient FMLA medical documentation. All other issues will be addressed . . . after [she] return[ed] to work." N.T. Ex. Employer 12.

Gaskin explained that, although Claimant's 2015 seasonal contract seemingly expired and Claimant had not received a new one, because Employer has an extensive discharge procedure, throughout 2016 Claimant was still reported as an employee under the union's collective bargaining unit. *See* N.T. at 38. Gaskin recalled that Claimant's official separation date was January 22, 2017. *See* N.T. at 38-39; *see also* N.T. Ex. Employer 15; R.R. at 12.

On November 17, 2016, Department of Labor and Industry's (Department) Audits and Investigation Supervisor Brad Bruyere (Bruyere) informed Claimant of Employer's notification that Claimant voluntarily quit her employment. *See* N.T. Ex. UC Service Center 15. On November 23, 2016, Claimant responded:

> I did not voluntarily quit. My 2015 seasonal contract ended. On June 25, 2015, [Employer] offered me a full-time position. I informed [Employer that] I am unable to accept a full-time permanent position due to my personal religious and family obligations. I have informed management I am interested in working and remaining as a seasonal employee. . . . To this date, management has not negotiated my 2016-2017 seasonal contract. I have living expenses to pay.

N.T. Ex. UC Service Center 18. At the December 6, 2016 meeting, Claimant clarified to Bruyere that she was scheduled to work on October 30, 2015, but was ill and did not report to work, then she left the country the following week. *See* N.T. Exs. UC Service Center 16, 17, 27. On December 14, 2016, Claimant notified Employer that she "did not voluntarily quit her seasonal position." N.T. Ex. UC Service Center 29.

9

Based on the foregoing, the Referee made the following relevant findings of fact:

> 7. On March 3, 2015, [Claimant] requested leave for the month of November 2015 to allow her to participate in a religious event. [Claimant] also requested that she be allowed to use accrued vacation leave to the extent she had such accrued leave and that the balance of her absence be approved as [LWOP].
>
> 8. By written memorandum dated March 23, 2015, [Claimant's] supervisor advised [Claimant] that: (a) her request to use accrued vacation leave to the extent she had such accrued leave in November 2015 was approved; (b) her request that the balance of her absence be approved as [LWOP] was denied; and (c) she could provide a 'repayment plan for working religious [comp]' for any time requested that was not covered by accrued vacation time.
>
> 9. [Claimant] did not provide a repayment plan for working religious [comp] . . . to her supervisor.
>
> . . . .
>
> 11. [Claimant] failed to appear for work at any time after October 29, 2015.
>
> 12. Continuing work was available to [Claimant] after October 29, 2015.

Referee Dec. at 1-2.

Based thereon, the Referee concluded Claimant was ineligible for UC benefits pursuant to Section 402(b) of the Law, reasoning:

> [Claimant's] direct supervisor provided credible testimony that: (a) by written memorandum dated March 23, 2015, she advised [Claimant] that: (i) her request to use accrued vacation leave to the extent she had such accrued leave in November 2015 was approved; (ii) her request that the balance of her absence be approved as [LWOP] was denied; and (iii) she could provide a 'repayment plan for working religious [comp]' for any time requested that was not covered by accrued vacation time.

10

[Claimant's] supervisor also provided credible testimony that [Claimant] had previously applied for and been granted approval for [a] repayment plan for working religious [comp] but failed to provide a repayment plan for working religious [comp] for her absence in November 2015. Finally, [Claimant's] supervisor also provided credible testimony that although continuing work was available to [Claimant] after October 29, 2015, [Claimant] failed to appear for work at any time after that date.

[Employer] also provided voluminous documentary evidence demonstrating in support of the testimony provided by [Employer's] witnesses at the hearing.

In this case, [Claimant] has failed to demonstrate that she had no other real choice but to leave her employment and that she took all necessary and reasonable steps to preserve [her] employment. . . .

Referee Dec. at 3.

The law is well-established that "[a]ll credibility determinations are made by the [UCBR]. The weight given the evidence is within the discretion of the factfinder. The [UCBR] is the ultimate factfinder." *Spadaro v. Unemployment Comp. Bd. of Review*, 850 A.2d 855, 860 (Pa. Cmwlth. 2004) (citations omitted). Here, on appeal from the Referee's decision, the UCBR held:

[T]he Board adopts and incorporates the Referee's conclusions. Finding of Fact No. 11 shall be replaced with the following, '[Claimant] failed to appear for work at any time after October 29, 2015, therefore she quit her employment.' The [UCBR] adds a finding, which shall read: '[Claimant] only had .25 hours of accrued leave as of October 29, 2015.'

. . . .

[Claimant's] last day of work was October 29, 2015. [Claimant] did not report to work thereafter despite the fact that her seasonal employment had not ended as of that time. The [UCBR] will note that [Employer] did not take any steps to separate [Claimant] from her employment in 2015 and had not furloughed [Claimant]. The [UCBR] concludes

11

that [Claimant's] failure to show up to work after October 29, 2015, and her lack of contact with [Employer] until 2016, evidences her intention to quit her employment. Therefore, this case is properly decided under Section 402(b) of the Law.

[Claimant] did not exhaust all alternatives prior to taking her leave of absence. [Claimant] was informed that she could provide a repayment plan for working religious [comp] for any time she requested in November 2015 that was not covered by her accrued vacation time. [Claimant] did not submit such a plan. [Claimant] provided only vague testimony as to why she did not take that option, namely that personal and religious obligations prevented her from working and repaying her time. The [UCBR] notes that [Claimant] was informed on March 23, 2015, that her request for [LWOP] was denied and that she could use religious comp time to cover the balance of time that [Claimant] did not have in accrued leave. [Claimant] has not adequately explained why she could not begin to accumulate religious comp time from that point forward until November 2015. [Claimant] indicates in her appeal to the [UCBR] that when she applied for religious [comp] time in the past, it was denied. However, [Claimant] testified at the hearing that she has utilized in the past and [Employer] confirmed such testimony. [Claimant] also insists that her employment ended in 2015. However, her contract stated her seasonal employment would last 9 [to] 11 months, which would have the assignment ending sometime between November 2015 and January 2016. [Employer's] witness credibly testified that [Claimant] was not furloughed as of November 2015.

UCBR Dec. at 1-2. "The [UCBR] determined that Claimant voluntarily left h[er] employment [without a necessitous and compelling reason]. A review of the record reveals that the [UCBR's] findings were supported by substantial evidence." *Spadaro*, 850 A.2d at 860.

The Pennsylvania Supreme Court has explained:

As this court stated in *Snyder v. Unemployment Compensation Board of Review, . . .* 502 A.2d 1232, 1236 ([Pa.] 1985):

12

> When this court defined 'necessitous and compelling' cause for leaving work as 'circumstances which produce pressure to terminate employment that is both real and substantial,' it was never contemplated that the 'circumstances' might be the employee's personal goals, aspirations or ambitions which conflicted with some reasonable policy or requirement of the employer.

*Du-Co Ceramics Co. v. Unemployment Comp. Bd. of Review*, 686 A.2d 821, 824 (Pa. 1996). The *Du-Co* Court held that the claimant voluntarily quit her employment and, thus, was not entitled to UC benefits when she attended training for a part-time job rather than reporting to work as scheduled, after the employer denied her vacation requests.

Here, as in *Du-Co*, Claimant consciously decided not to report to work in November 2015 despite she was denied LWOP status, she did not have sufficient annual or other leave, and she had not been furloughed. Claimant failed to contact Employer when she returned from her trip on or about November 15, 2015, and failed to respond to any of Employer's repeated, documented attempts to contact her from November 2015 through June 2016. Even when Claimant responded, she refused everything but seasonal employment during specific days and hours. Thus, although Claimant did not expressly resign her position, she refused to work and declined available employment. Claimant failed to produce evidence that her mother's health, her health and/or her religious obligations prevented her from returning to work. Under such circumstances, this Court rules that Claimant voluntarily quit her employment without proof of a necessitous and compelling reason. Accordingly, the UCBR properly concluded that Claimant is ineligible for UC benefits pursuant to Section 402(b) of the Law.[13]

---

[13] On February 23, 2018, Claimant filed an application to stay repayment of her fault overpayment (Application) pending this appeal. In light of the Court's ruling herein, Claimant's Application is dismissed as moot.

13

Based on the foregoing, the UCBR's order is affirmed.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carla Slater,                           :
                    Petitioner          :
                                        :
           v.                           :
                                        :
Unemployment Compensation               :
Board of Review,                        :     No. 958 C.D. 2017
                    Respondent          :

## O R D E R

AND NOW, this 13th day of March, 2018, the Unemployment Compensation Board of Review's June 20, 2017 order is affirmed.  Carla Slater's Application for Stay is dismissed as moot.

_____
ANNE E. COVEY, Judge