## Dickson v. Federal Kemper Insurance Co.

*Willis E. Schug*, for plaintiff.
*Donald R. McKay*, for defendant.

WALKER, *J.*, June 17, 1982 — Barbara Dickson was fatally injured in an automobile accident on April 5, 1979. Defendant insurance carrier had issued a standard no-fault insurance contract to plaintiff and his wife, decedent. Plaintiff has brought this action to recover replacement services as a part of survivor's loss under the No-fault act. Both plaintiff and his daughter, Lori Shetler, were deposed and interrogated relating to the alleged contract for the payment for replacement services. Defendant has now filed a motion for summary judgment which is before us for disposition.

As a part of the definition of "survivor's loss," there is included "expenses reasonably incurred by a survivor or survivors after a victim's death resulting from injury, in obtaining ordinary and necessary services in lieu of those which the victim would have performed not for income but for their benefit if he had not sustained the fatal injury." 40 P.S. 1009.103. This definition is substantially identical to the definition of replacement services loss which is applicable to living victims and extends that recovery to the survivors of deceased victims:

Brandon v. Erie Insurance Exchange, 264 Pa. Superior Ct. 258, 399 A. 2d 765 (1979).

Both parties have discussed at argument and in their briefs the presumption that a child performs services for his or her parent gratuitously. We do not believe that that presumption is compelling in this situation. The No-fault act does not limit the class of persons from whom replacement services can be obtained. In the recent case of Habecker v. Nationwide Insurance Co., (opinion filed May 14, 1982, no. 116 Dauphin County 1981), the issue before the court was the construction of the statutory time period through which replacement services loss would be paid. Although the appellate court opinion does not so indicate, it is our understanding that the furnisher of the replacement services was, in fact, an immediate relative, and, therefore, although the issue was not specifically argued, it would seem that the Superior Court has tacitly approved the payment of replacement services loss where the obligation was incurred to a member of the family.

The real issue before us is an interpretation of the phrase "expenses reasonably incurred" as used in Section 103 of the No-fault act. In construing a statute relating to insurance, doubts must be resolved in favor of coverage for the insured and insurance policies and statutory provisions in relation thereto must be given the broadest possible effect: Allstate Insurance Company v. Heffner, 491 Pa. 447, 421 A. 2d 629 (1980). This philosophy is also borne out by the findings and purposes clause of the No-fault Insurance Act as expressed by the legislature: 40 P.S. 1009.102. It is also true, however, that "words and phrases shall be construed according to rules of grammar and according to their common approved usage." 1 Pa.C.S.A. 1903;

Kury v. State Ethics Commission, 62 Pa. Commonwealth Ct. 174, 435 A. 2d 940 (1981); Wajert v. State Ethics Commission, 491 Pa. 255, 420 A. 2d 439 (1980).

The word "incur" is a transitive verb meaning "to become liable or subject to: (to) bring down upon oneself." Websters New Collegiate Dictionary, 1977 Edition. Plaintiff is, therefore, entitled to those reasonable expenses for ordinary and necessary services that would have been performed by his deceased wife, if he has "incurred" those expenses. This must be construed as requiring that he has become legally liable for those expenses. In order to recover, plaintiff must show either that he has paid some amount for such services or is legally liable to pay some amount. Had the legislature intended otherwise, they would have used language similar to that used in defining "allowable expense" in section 103, where the language defining that term is "reasonable charges incurred for, or the reasonable value of (where no charges are incurred) reasonably needed and used products, services and accommodation for . . . ." Clearly the legislature understands the difference between incurring an expense for services and recovering the reasonable value of those services if no expense was, in fact, incurred. In the definitions of both "replacement services loss" and "survivor's loss," the requirement is that the expenses be incurred. This definition of "incurred" is supported by Geiger v. Reserve Insurance Company, 94 Montg. 378 (1972).*

---

*Although the Montgomery County report indicates that the case was appealed to the Superior Court, we found no reported Superior Court disposition. Further checking reveals that that appeal was withdrawn and the Superior Court never passed upon the issue.

In the treatise on No-fault Insurance published by the Pennsylvania Trial Lawyers Association, a group certainly philosophically inclined toward expanding coverage to its broadest dimension, we find the following language:

"Unlike recovery of the allowable expense benefits which specifically includes a claim for 'the reasonable value' of medical services or even work loss where, arguably, gratuitous payments in lieu of wages may be recovered as 'accrued economic detriment', the statutory definition of replacement services loss depends upon 'expenses reasonably incurred'. If the spouse or relative renders the services gratuitously, it would seem that the victim should be prohibited from claiming no-fault benefits for such replacement services." Shrager, The Pennsylvania No-fault Motor Vehicle Insurance Act, 97.

It is clear that the mere fact that plaintiff in this case is a survivor by definition under the act does not permit recovery of survivor's loss without proof of entitlement to survivor's loss benefits: Wercoch v. Liberty Mutual Insurance Company, 287 Pa. Superior Ct. 45, 429 A. 2d 712 (1981).

Turning now to the factual situation before us and applying the legal principles which we have enumerated, a review of the depositions of plaintiff and Lori Shetler, his daughter, who is the alleged obligee to whom he incurred the expense, reveals no legally enforceable oral contract between the parties. In fact, given the honesty of the deponents, it tends to disprove the existence of a legally enforceable obligation.

Lori Shetler was separated from her husband and had been living with her parents along with her three children for several months prior to the acci-

dent in which her mother was killed. There was no substantial change in the services · performed around the house before or after her mother's death except that in all probability, she and her mother may have shared those chores prior to her mother's death. There was no discussion of any payment for the services she performed until approximately a year after her mother's death, and it is plaintiff's theory that the obligation began at or about April 10, 1980. At page 6 of the deposition, plaintiff testified:

"Q. Did Lori work anywhere?

A. No.

Q. Prior to your wife's death, did she help around the house some?

A. Oh, yes. Yes, yes.

Q. When was the first discussion, if any existed, between you and your daughter, Lori Shetler, as to paying her for the help around the house after your wife died?

A. It was around the first of April, 1980, somewhere in around there that we discussed it.

Q. Around the first of April, 1980?

A. Somewhere around there, yes.

Q. In other words that would be about — this is July, so it would be April of this year, is that right?

A. Right.

Q. That would be about a year after your wife died?

A. That's right."

Further, it is clear that even under plaintiff's theory, the contract was totally conditional upon plaintiff obtaining the money from defendant. For example, at page 8 of the deposition:

"Q. When were you to start giving her that?

A. Whenever I got the money."

And in answer to a question by his own counsel, plaintiff testified at page 11 of the deposition:

"Mr. Schug: I have one question, Mr. Dickson, if you get enough money, will you actually pay Lori?

The Deponent: If I get the money, she will get it."

By the same token, the deposition of Lori Shetler indicates that she did not consider her father legally obligated to pay her, but that she would take the money if offered. At page 17 of the deposition, we find:

"Q. Whenever you had this discussion, which your father thought was in April of '80, what was said?

A. He just asked me if I — if he could pay me for doing the housework.

Q. What did you say?

A. I told him that I really didn't want to be paid, but if he wanted to, that I would take the money cause I could use it."

It can be argued that plaintiff is being penalized by his honesty in reciting the arrangement or lack thereof with his daughter. In theory, at least, he could have written a check or checks to his daughter and presented those as evidence of having incurred the obligation and thus avoided the problem with which we are presently confronted even if his daughter had then returned the money to him. Be that as it may, we must decide the case that is before us.

It is clear that, based upon the depositions, if Lori Shetler were to sue her father for $25 a day from April 10, 1980 for performing household services for him, she could not succeed. By her own admission, she performed the services gratuitously and would accept money only if voluntarily offered. Further, plaintiff could defend in such an action on the ground that his promise to pay was at the most

conditional upon his obtaining the money from another source. In effect, the present action is an effort to rewrite the No-fault law so that replacement services loss will include the reasonable value of those services where no actual obligation has been incurred. If the act is to changed in that manner, it is the legislature's prerogative to make the change.

## ORDER

And now, June 17, 1982, summary judgment is entered in favor of defendant.